UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ) | | CASE NO.  3:12-cr-00003-CMK |
| Plaintiff, ) | | |
| vs. ) | | MEMORANDUM of OPINION; |
| JAMES SHERER, ) | | JUDGMENT |
| Defendant. ) | | |
| _____ ) | | |

This case came on regularly for trial on March 12, 2012, at the United States District Court in Redding, California, the Honorable Craig M. Kellison, United States Magistrate Judge, presiding; the United States Forest Service [government] appeared by and through Rule 180 Prosecutor, Special Law Enforcement Officer, Joseph Cook, and the defendant, James Sherer [Sherer], appeared by and through retained counsel, Joseph Gazzigli.

The matter proceeds to trial by way of a criminal complaint charging the defendant in Count I of violating 36 C.F.R. § 261.9(b) "[r]emoving any natural feature or other property of the United States;" Count II of violating 36 C.F.R. 261.3(a) "[t]hreatening, resisting, intimidating, or interfering with any forest officer engaged in or on account of the performance of his official duties in the protection, improvement, or administration of the National Forest System;" and Count III of violating 18 U.S.C. 111(a)(1) one who "[f]orcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 114 of this title while engaged in or on account

1  of the performance of official duties."

2     Prior to the commencement of trial, the Court dismissed Count I on motion of the
3  government, and the Court dismissed Count III upon the conclusion of trial pursuant to Rule 29
4  F.R.Crim.P.

5     The remaining charge stems from an investigative stop [contact] on December 17, 2011.
6  While on uniformed patrol that day, Forest Service Law Enforcement Officer Adam Nadeau
7  [Nadeau] observed the Defendant, Jim Sherer exiting National Forest System (NFS) Lands in a truck
8  and trailer loaded with what appeared to be gravel.

9     Nadeau  recognized Sherer from a previous encounter involving the unauthorized removal
10 of firewood from NFS lands.   Because Sherer was exiting NFS lands from a road leading from a
11 gravel pit known as the "Loveness Pit," Nadeau effectuated a traffic stop to inquire whether the load
12 was properly permitted.

13    Since most of the contact was video-recorded, via a dash cam (Exh. 2 'video'), the ensuing
14 conversations and interaction between Nadeau and Sherer are not subject to dispute.  The contact
15 began to deteriorate when Sherer was unable to produce either a driver's license or any type of
16 special use permit or authorization for his load of gravel.  Complicating  matters was Sherer's less
17 than satisfactory demeanor and repeated use of expletives.

18    Conversely, Nadeau had problems of his own.  He appeared unsure how to proceed  with an
19 an apparent theft or special use violation coupled with the difficulty he encountered with Sherer.
20 Eventually, Nadeau became frustrated with the situation, and Sherer was arrested for "use without
21 permit," placed in Nadeau's vehicle and taken on a seven hour odyssey on the back roads of
22 northeastern California.[1] Sherer then spent the next several days incarcerated.

23

24

---

25    [1] Nadeau had chosen to take his wife as a ride-along on the day in question.  This fact created a logistical problem
26 when Sherer was placed under arrest.  The closest  approved federal detention centers were located in Redding, Red Bluff and
   Susanville, California.  Instead Nadeau chose to drop his wife off at their home in Tule Lake, California, which was located in
   the opposite direction of any of the approved detention facilities.  He then continued to drive  westerly to Mt. Shasta City to
27 allow Sherer to receive medical treatment for his diabetes and to personally seek medical attention for an injury he sustained
   during this contact.   Sherer was then driven south to Red Bluff where he was booked and detained for several days.

28

1   The government contends that Sherer "interfered" with Nadeau during the contact, while

2   Sherer maintains that he had done nothing to subject himself to arrest and that his resistance, if any,

3   dealt only with seeking answers to his detention.

4

5                                           APPLICABLE LAW

6       For purposes of 36 C.F.R. § 261.3(a), a forest officer is performing an 'official duty' when

7   the officer is on duty and performing an act that contributes to the protection, improvement, or

8   administration of the National Forest." United States v. Willfong, 274 F.3d 1297, 1300 (9th

9   Cir.2001) (citing United States v. Ryberg, 43 F.3d 1332, 1334 (9th Cir.1995)).  Here, it is clear that

10  Nadeau was performing an "official duty" during his contact with the defendant while investigating

11  the removal of gravel from NFS lands.

12      In Willfong, the Ninth Circuit held, over a strong dissent, that the defendant's failure to obey

13  a forest officer's order constituted "interference" with the officer as a matter of law, and that

14  defendant's failure to use physical force to do so was irrelevant. 274 F.3d at 1301-1302.  As in the

15  present case, the regulation in question was 36 C.F.R. § 261.3(a),  and the order in question in

16  Willfong was an order to desist logging operations on Forest Service Land.  Defendant politely

17  refused to shut down his operations under threat of arrest, and after his arrest, he told his crew to

18  continue working.  The Willfong court cited several state law cases for the proposition that failure

19  to obey an order was sufficient to rise to the level of "interference." See  State v. Boone, 243 Ga.

20  416, 254 S.E.2d 367 (1979), cert. denied, 444 U.S. 898, 100 S.Ct. 206, 62 L.Ed.2d 133 (1979)

21  (refusal to obey order to vacate building constitutes interference); Ratliff v. State, 133 Ga.App. 256,

22  211 S.E.2d 192 (1974) (refusal to obey order to stop attempting to enter a premises being searched

23  constitutes interference); City of Chicago v. Lynd, 47 Ill.2d 205, 265 N.E.2d 116 (1970), cert.

24  denied, 402 U.S. 923, 91 S.Ct. 1383, 28 L.Ed.2d 662 (1971) (refusal to obey order to clear the street

25  constitutes interference); State v. Manning, 146 N.J.Super. 589, 370 A.2d 499 (App.Div.1977)

26  (refusal to obey order to re-enter vehicle constitutes interference);  Township of East Brunswick v.

27  Malfitano, 108 N.J.Super. 244, 260 A.2d 862 (App.Div.1970) (refusal to obey order to provide one's

28  name and address constitutes interference).   In discussing a separate regulation concerning public

1   lands (36 C . F.R. § 261.3), the Ninth Circuit consulted Webster's New World Dictionary to define

2   "interfere" as to "oppose, intervene, hinder, or prevent." Willfong , supra at 1301.

3       The U.S. Supreme Court has adopted a per se rule that  "an officer initiating a traffic stop

4   may order passengers out of a vehicle pending completion of the stop." Maryland v. Wilson, 519

5   U.S. 408, 409 (1997).   Similarly, an officer may also confine a passenger to the stopped vehicle.

6   United States v. Williams, 419 F.3d 1029, 1034 (9th Cir.2005) ("under the Fourth Amendment it is

7   reasonable for an officer to order a passenger back into an automobile that he voluntarily exited

8   because the concerns for officer safety originally announced in Wilson, and specifically the need for

9   officers to exercise control over individuals encountered during a traffic stop, outweigh the marginal

10   intrusion on the passenger's liberty interest"). When a vehicle is lawfully stopped the passenger is

11   "for the time being, going nowhere." Ruvalcaba v. City of Los Angeles, 64 F.3d 1323, 1327 (9th

12   Cir.1995).

13       A law enforcement officer is permitted to investigate possible criminal behavior or activity

14   even though there is no showing that probable cause to make an arrest of the individual was then

15   extant.  Florida v. Royer, 460 U.S. 491 (1983).  This is normally referred to as having probable

16   cause to investigate or probable cause to make a "Terry stop."  See, for example,  Brown v. Texas,

17   443 U.S. 47, 51 (1979);  Terry v. Ohio, 392 U.S. 1 (1968).  However, the inarticulate hunch,

18   suspicion, or good faith of an arresting officer is insufficient to constitute probable cause to arrest.

19   Brown v. Texas, supra.  Thus, even though the law gives to law enforcement officers the right to

20   make an investigatory stop of an individual, this right is conditioned that at that time the officer must

21   have "probable cause to investigate", which exists only where the circumstances indicate that the

22   particular person either has committed or is preparing to commit a crime.   Therefore, in order to

23   justify temporarily detaining a person for the purpose of conducting a criminal investigation, where

24   the officer does not have probable cause to make a warrantless arrest, he must still have specific

25   articulable facts which, in light of his experience and personal knowledge, together with other

26   inferences from those facts, would reasonably warrant the intrusion on the freedom of the citizen.

27       The reasonableness of the law enforcement officer's need to detain an individual for

28   questioning  must be balanced against the defendant's Fourth Amendment rights.  Every individual

1   has a constitutional right to be free from arbitrary or unreasonable stops by law enforcement.  See,

2   e.g., United States v. Brignoni-Ponce, 422 U.S. 873, 878  (1975).

3   "[T]he First Amendment protects verbal criticism, challenges, and profanity directed at

4   police officers unless the speech is 'shown likely to produce a clear and present danger of a serious

5   substantive evil that rises far above public inconvenience, annoyance, or unrest.' " United States

6   v. Poocha, 259 F.3d 1077, 1080 (9th Cir.2001), quoting City of Houston v. Hill, 482 U.S. 451, 461

7   (1987). "[M]ere remonstrances or even criticisms of an officer are not usually held to be the

8   equivalent of unlawful interference." Willfong at 1302, quoting District of Columbia v. Little, 339

9   U.S. 1, 6 (1950) (discussing D.C. regulation which prohibited interfering with a health officer

10   performing an inspection).

11   Thus, to prove its case, the government is required to prove beyond a reasonable doubt that

12   Sherer interfered with Nadeau in the performance of his official duties. This may be done by

13   showing, for instance, a repeated refusal to provide identification, when requested.  United States

14   v. Cortesi, 2008 WL 4966754 (E.D.Cal. 2008); failure to follow a Ranger's commands, Willfong,

15   supra;  United States v. Bass, 82 F.3d 811, 812 (8th Cir.1996); or ripping up and otherwise failing

16   to heed a citation, United States v. Meryam Zislovich, Fed. Appx. 607, 2005 WL 2250741 (9th Cir.

17   2005).

18   Force is not a required element of interference. Willfong, supra at 1302-1303. In fact, very

19   little is required. By way of illustration, in United States v. Bass, the defendant was convicted of

20   violation § 2.32(a)(1) after disobeying a ranger's order during a traffic stop to stay at the rear of his

21   vehicle. 82 F.3d at 812.

22   DISCUSSION

23   The affidavit in support of criminal complaint (Exh. 1) and the testimony of Nadeau attempt

24   to portray Sherer as a man simply looking for trouble.  The sum of Nadeau's testimony suggests that

25   Sherer was combative, refused to answer questions and to obey numerous orders.  The video (Exh.

26   2), however,  either belies these assertions or paints the scenario in another light.    Attempting to

27   define what specific actions or events during the contact constitute a violation of § 261.3(a),

28   however, is problematic.

1    During trial, the government focused on the alleged failure of Sherer to exit his vehicle and

2    shut down his engine when ordered to so.  The government also suggests that Sherer's responses

3    to questions were either non responsive, or evasive.  A triggering event appeared to be when Sherer

4    resisted Nadeau efforts to open the cab door at the beginning of the contact.

5    Common sense dictates, however, that not every response or action by the defendant which

6    is not in lockstep with orders of law enforcement rises to the level of interference.  The court is

7    mindful that in certain situations a defendant's initial refusal to comply followed by a delay and

8    ultimate compliance (delayed cooperation) is not tantamount to a finding of interference as

9    envisioned under Willfong.   The freedom of individuals verbally to oppose or challenge police

10   action without thereby risking arrest is one of the principal characteristics by which we distinguish

11   a free nation from a police state.  See Houston v. Hill, supra at 461-63.   United States v.

12   Brignoni-Ponce, supra at  880-881.

13   Certainly, Sherer could have handled the situation in a more diplomatic manner.  The

14   contact could have preceded much more smoothly had Sherer attempted to explain the nature of his

15   contract or special use authorization to remove gravel, and cooperated by assisting Nadeau in

16   locating the source of the gravel on the map.

17   If the assertion is that Sherer "interfered" with Nadeau by refusing to shut off his engine and

18   exit his vehicle, it does appear that Sherer did ultimately comply with both of these requests.   This

19   is different from the situation in Willfong where the defendant refused, and continued to refuse the

20   repeated orders of the law enforcement officer.  See, generally, United States v. Cortesi, supra (five

21   requests, no compliance); United States v. Willfong, supra (repeated requests, no compliance);

22   United States v. Bass, supra (three requests, no compliance); United States v. Meryam Zislovich,

23   supra (request and destruction of violation notice); United States v. Bucher, 375 F.3d 929 (9th Cir.

24   2004) (order, direct refusal to obey).  This distinction coupled with the initial aggression by Nadeau

25   in attempting to open the cab door of Sherer's vehicle; his marginal efforts expended in attempting

26   to defuse the rising tension; and in his total lack of investigation of the alleged special use violation

27   makes it difficult to find Sherer's actions culpable.

28   The court has viewed the video (Exh. 2) several times.  Although the court does not condone

6

Sherer's language or demeanor during the contact, it cannot conclude that Sherer's actions constituted "interference" as envisioned by Willfong. The video belies the government's claims that Sherer caused a safety risk to Nadeau and fails to support the alleged severity of Sherer's behavior.

Before first approaching Sherer's vehicle, Nadeau informed his wife that Sherer was "my guy that I stopped," referring to an incident that had occurred a month earlier. Nadeau then approached the side of Sherer's vehicle and inquired what Sherer was doing and where he was coming from. Nadeau then asked whether Sherer was licensed and possessed a special use permit for the gravel. Although, Sherer's responses were sometimes profanity laced, he did indicate that he was a licensed driver and had special use authorization to remove the gravel. During this initial exchange of information, Nadeau did ask Sherer to shut down his engine, but almost simultaneously, without notice, attempted to open Sherer's cab door. Whether this was attempted to physically remove Sherer, or to simply shut off the engine is unclear, but the event certainly proved to be a game changer. Sherer resisted this effort and Nadeau was burned by coming into contact with the exhaust pipe. Nadeau then returned to his vehicle and informed his wife that "this guy is a pain in the ass, I almost pepper sprayed him."

During this time Nadeau received word from dispatch that Sherer possessed a valid California driver's license. Nadeau then returned to Sherer's vehicle for a second time. He ordered Sherer to "step out." Sherer complied. Nadeau asked Sherer to point out on the map the location where the gravel was obtained. Sherer indicated that he didn't have his reading glasses, but that the gravel was obtained from the "Loveness Pit". Nadeau again asked Sherer if he had a special use permit, to which Sherer responded in the affirmative. Nadeau then asked if Sherer was carrying the permit, and Sherer responded that it was in his shop and "it [permit] doesn't say I have to carry it."

Nadeau then returned to his vehicle and stated to is wife "start emptying the back seat, we are going to take him to jail." After a period of time (presumably while the back seat was being cleared) Nadeau returned to Sherer's vehicle.  Sherer  asked Nadeau twice whether he was going to receive a ticket. Nadeau did not answer. Sherer then requested that he be cited so that he could be on his way. Nadeau twice informed Sherer that he was under arrest. Sherer asked what he was

1  under arrest for, but received no answer.  Nadeau then ordered Sherer from his vehicle informing

2  him that he was going to jail.  Sherer again asked "what are you taking me to jail for," and Nadeau

3  responded by saying "use without a permit."  Sherer stated that "I told you, I have a permit."  Sherer

4  was then cuffed and placed in Nadeau's vehicle.

5       Sherer was only informed after several requests that he was being arrested for "use without

6  a permit."  The court has no record of any charging document being prepared on the day in question

7  which presumably would have been required during booking.  Necessarily, this would have required

8  a statement of probable cause.  Although, Sherer repeatedly informed Nadeau that he had special use

9  auhtorization, it is clear that Nadeau did nothing to verify this assertion.  The video reflects that

10 Nadeau made no effort to question Sherer regarding the nature and aspects of his special use

11 authorization and did not attempt to make any contact with third parties prior to announcing to his

12 wife the he was taking Sherer to jail. Although, the court understands that verifying the existence of

13 the Sherer's special use authorization would have been more difficult because of the weekend, it

14 appears that other alternatives, short of arrest, were never pursued, e.g., providing Sherer an

15 opportunity to submit proof of his contract or special use authorization at a later time.[2]

16      Similarly, it also appears that Sherer's assertion that physical possession of the permit was

17 not required also went upon the deaf ears of Nadeau.  This leads the court to conclude that Sherer

18 was arrested simply because Nadeau believed that he was lying.  Sherer deserved much better.  The

19 court also expresses pause in how the government allowed this situation to deteriorate to such a

20 degree in the context of such a minor alleged violation.  See, <u>Welsh v. Wisconsin</u>, 466 U.S. 740,

21 753(1984).  Customarily, minor special use violations are generally resolved informally, or by the

22

23      [2]The forest service did not have the authority to cite or arrest Sherer for not having a valid  driver's license in his
24 possession, (36 C.F.R. § 261.13(i) and 36 C.F.R. § 261.15(I)).  Since Sherer had informed Nadeau on several occasions that he
   had a special use permit, Nadeau's decision to arrest must have been predicated only on the hunch that Sherer was lying.
25 Although, Nadeau was somewhat limited in verifying the legality of Sherer's removal of gravel because the district headquarters
   were closed for the weekend, he apparently opted for the more dangerous alternative of arresting first, and investigating latter.
26 Nadeau could have simply followed Sherer to his residence in Canby to verify the documents regarding the removal of gravel.
   Canby was certainly closer than the trek taken to Red Bluff.   Although the government may argue that Nadeau's decision to
27 arrest was predicated on Sherer's demeanor, poor demeanor does not equate to interference and the evidence supports the fact
   that Nadeau was predisposed to arrest Sherer when he informed his wife that he was taking him to jail without any effort to
   investigate the special use issue.

28

1    exchange of correspondence.

2

3                                        CONCLUSION

4          The court finds that the defendant is not guilty of violating 36 C.F.R. 261.3(a)

5    "[i]nterfer[ing]. [t]hreatening, resisting, intimidating, or intentionally interfering with a government

6    employee or agent engaged in an official duty, or on account of the performance of an official duty".

7

8     DATED:   May 17, 2012

9                                                    _____

10                                                   CRAIG M. KELLISON
                                                      UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                 9